Case number 23-1248, Coalition for Renewable Natural Gas Petitioner v. Environmental Protection Agency. Mr. Ellis for the petitioner, Ms. Kingball for the respondent, Statutory Authority for the biogas regulations, Mr. Poporo for the respondent, Arbitrary and capricious and procedural challenges. May it please the court, Jonathan Ellis on behalf of the Coalition for Renewable Natural Gas. The Renewable Fuel Standard is unique among EPA's regulatory programs. Rather than command and control, the RFS is designed to act as a market-forcing mechanism to incentivize the creation of renewable fuels and the environmental benefits that come with them. For a decade after EPA permitted Renewable Natural Gas to participate in that program, the design worked. The creation of RNG increased fourfold on the back of substantial investments by the regulated community. Today, transportation fuel created from RNG accounts for nearly all cellulosic biofuels that were created in the RNG program or RFS program,  We're here this morning because several unlawful changes in the biogas reforms threatened that success. In the biogas reforms, EPA almost completely rewrote the regulatory program for RNG. It rewrote the rules for how parties register, test, record, and report their activities, and how they create and separate the credits for renewable fuels, called rents, all to guard against the potential for fraud. Now, to be clear, to the extent those requirements roughly align the production and regulation of RNG with other renewable fuels, we don't take issue with them. Importantly, that includes the use of the EPA's moderated transaction system, or RENs created from RNG, and replacing the need for EPA to review a complicated set of related contracts to verify the proper creation and retirement of RENs from RNG. In several respects, however, the biogas reforms went well beyond the regulatory requirements that EPA imposes on the creation of other renewable fuels, and beyond any reasonable fraud-protective measures. Although I'm happy to address any aspect of our challenge this morning, I'd like to focus the Court on three components of the biogas reforms that we find most problematic. First, the direct regulation of biogas producers. Second, the prescriptive continuous measurement requirements for biogas producers and RNG producers. And third, the annual pipeline quality testing requirements. First, the direct regulation of biogas producers. EPA claims authority for the direct regulation of these entities based on their responsibility and obligation under Section 02A1 to ensure that RFS volume obligations are met. But 02A3 tells EPA specifically who is to be the subject of compliance regulations under that provision. It is the obligated parties, the refiners, the distributors, importers and blenders of transportation fuel, not dairy farmers, and cities and counties operating landfills and municipal wastewater facilities. So if the statute didn't have Clause 3, would you agree that Clause 1, which essentially says EPA shall ensure that the renewable fuel targets are met, would that naturally be read to include the ability to regulate anybody in the production chain, including biogas producers? I still think we have concerns about how far that goes. It's a vague term, and I don't think that you can read that to reach back the entire production chain. I take it on EPA's reading to the trash I put outside my door that's eventually going to be in the production chain here. But I don't think that's really an issue here because of the 02A3, which tells EPA exactly who it's supposed to regulate there. Absolutely. So, I mean, the idea is that it at least seems to me that you're asking us to read subclause 3 as creating a limitation on power. And I'm just wondering how you get there with the words that it uses. So it says shall contain. It does not say shall only contain, you know, shall regulate these parties but not others. So how do we why should we read it as a limitation on EPA's otherwise applicable? So two answers to that, Your Honor. The first is I think this is the idea that it has to be a floor or it's a floor, not a ceiling. And I don't think that can work. I mean, what the provision says goes on to say is that it shall contain compliance provisions applicable to refiners, lenders, distributors and importers, quote, as appropriate. And so it doesn't even require EPA to regulate those entities. So the idea that it is a floor doesn't make a great deal of sense. The second thing I'd point out is that I don't think that this court's decision and heating, A.C. and refrigeration distributors dealt with a very similar problem there. And in fact, it dealt with the same word insure. And what the court said there was not that the separate provisions in the act really put put a were used in exclusive language, but that they told EPA there how to insure. And there was the HFCs did not exceed a cap on production. And in the light of that, in light of that specific direction to EPA about how to insure, they couldn't rely on the vague term, the vague of insure to go beyond that and implement complimentary compliance regulations. Now, EPA is under that reading. Are they not allowed to regulate auditors? So under that, I think they have additional authority under 05, Your Honor. That's the provision that allows them and requires them to create a credit program. And so I think there they have regulated, long regulated RNG producers, for example, who are generating the rents and other entities who are separating the rents, who are engaged and interacting with those credits. They haven't relied on that authority here. And for good reason, because in the biogas reforms, they require only RNG producers to create those rents and they do not allow biogas. RNG producers aren't on this list either, so they can't regulate them. They can't impose any compliance provisions on them. So apart from the rent process, is that your position? That's right. I mean, I think apart from the rent process, when they're touching the rent process, when they're creating this rent process, that may be true. And there may be, you know, there may be other places where they can identify authority, but this is not the. The regulation you're challenging here doesn't implicate. It's hard to figure out since rentless drive this whole process, how they are not implicated at every stage, just as well, at least at this this end of the entire process. I'm not talking about the consumer at the gas pump, but it's hard. It seemed like an awfully difficult line to say that what they did here was a compliance provision. And the compliance provisions can't include compliance with the rent process. So I think that if they're going to regulate rely on 05 and they have not here, they need to tie it to the rent process. They haven't tried to do that. And I think it would be I think there has to be a line documentation. It's not only sort of the trading system it creates, but it is a way of tracking the fuel as it goes through the process to make sure things get commingled pipelines. And they need to make sure that what comes out of. The landfill and goes into pipes into the renewable gas producer and comes out at the end of another pipeline is the renewable fuel and wasn't mixed with something else. And so they have to part of the way you have to have compliance provisions. Overlap with anyone who's involved in the regeneration process so they can make sure they can ensure the requirements, the production of the required amounts of renewable fuel are met. It seems to me like a very artificial distinction. So two points on that, Your Honor. Again, the biogas producers are not involved in the generation program. No, they are not, but they're not on the list either. Correct. And that's why we are not disputing the regulations here of the RNG producers who create. They're not on the list. There's no producers on this list. Right. So let me try this again because I must I was not unclear. I think there are there's two sources of authority we're pointing to here. Right. We are identifying one is O2A3. So the compliance regulations go to the obligated parties. That's the only the O2A1. One is the only authority they've relied on here. The other is 05. That's a separate bucket of authority. They have not invoked that here and they haven't attempted to. But if they did, we think that they could justify the regulations of the RNG producers because they have to regulate. And they have to provide for the creation of the RINs and the RNG producers are creating. But you're requiring us to make a reading that would say they can only do it under that provision and they cannot. Maybe they could do it all there, but they cannot invoke the 2A1 authority at all as to renewable. Under your reading, because I know your step earlier on the biogas producers, but producers are not on the list in section three, Roman at three. So they can't rely on it. But if that's needed to ensure. That the amount of fuel and only renewable fuel it's properly labeled as such gets through. And say, for some reason, they didn't need to do it as part of the RIN process, you'd say they just can't do it. I'd say they could do it under 05. I'm not sure why it matters which one they invoke. I think they can regulate. We're not disputing that they can and have regulated RNG producers. And I think there's an important point here because going to your sort of how do they do this point. This is what they've done since the initiation, the creation of the RFS program. They have always regulated the renewable fuel producer and they've done that under 05. They've done that in the creation of the RINs and they have never reached back to the feedstock producer. And outside of the biogas reforms, they still do not. And so you ask, you say they have to be able to ensure that the biogas is created or the renewable fuel is created from a renewable biomass. And I agree with you, Your Honor, but they've done that elsewhere by regulating the renewable fuel producer and requiring that entity who is actually engaged in the creation of renewable fuels. Biogas producers are dairy farmers and landfills and counties and cities who are not engaged in this process. Under the prior regime, the biogas producers were certainly at least indirectly affected, right? They had to provide information or hopefully some kind of assurance to the RNG producers about what they're providing them, didn't they? And so in the prior regime, whoever was going to generate the RIN had to provide that documentation. And yes, in instances, they would ask for the biogas producer to help them, the contract partner, right, to actually provide that. So can you tell us why? I understand it's much more burdensome now, but why is it materially different now? Because I think on EPA's telling, they're still saying it is entirely voluntary whether you want to be a biogas producer that provides biogas for the RFS program. And so when you do, you're going to have to now register and provide all of this information. Before you were providing some lesser information to others, now just provide it directly to the EPA. Right. So I think the voluntary nature of this actually cuts against them in a fundamental way, right? So it's true they had to provide some information, biogas producers, these landfills and cities and counties had to provide some documentation to the RNG producer. But EPA's own numbers indicate that they have increased the compliance costs on those landfills, dairy farmers, 59 times in this regulation. That's a meaningful burden for somebody who's not in the business of renewable fuel production. And the reason that matters, the reason that cuts against EPA and not for them, is that this is a market forcing mechanism. The whole program is designed to incentivize the creation of renewable fuels. If the biogas is not collected from the landfills and the dairy farms and sent to be this productive use, then it's going to be used for flaring. It's going to go into the atmosphere as a potent natural gas. It sounds more like a policy argument, because you said once they choose to be part of the renewable fuel production system, that's the only time they have to comply with these regulations, which are ensuring it's the appropriate fuel stock or feed stock, whatever you call it, waste stock. It's an appropriate source for renewable fuel. That's what they're obligated to do only if they choose to. So it's only if they choose to get into this system that they have to do it. Sure. So I think it is relevant policy concerns that's going to dissuade people, then that's that's on that's on EPA. So I think it is relevant to the statutory question, because I think that's that we have to read the statute in a way that complies with Congress's goals. And that's that is certainly one of the goals. But we also have arbitrary capricious challenge here, Your Honor. And I think it's important to note this is unreasonable burden and they don't impose it on any other feedstock producer. So they say we can only get this information from the biogas producer. We can only check the renewable biomass with them. But that's not what they do for biodiesel. Biodiesel has a soybean farmer, has a soybean oil crusher and then has a biodiesel producer who takes that that soybean oil and turns it into a renewable diesel or biodiesel. And they don't regulate the soybean oil crusher. They don't regulate the soybean farmer. They still manage to figure out that that is the only source. I'm sorry. So it brings the only source for that biodiesel for renewable diesel. I believe the Soviets are the only source. It's not true for ethanol. No, but it's corn. But I think there's there's there's lots of different feedstocks that can be used that waste that will produce. Biogas in a generic sense, there's only certain types of that that they want to come into the system. And that's why they have to have this regulation to make sure it's the right type of biogas producer that's essentially hooking up to the renewable fuel producer. So I'm not sure that that explains why you couldn't ask for that documentation from the renewable fuel producer. And they suggest that they can't. Is it any better if EPA obligates the renewable fuel producer to require the biogas producer to provide this information? How is that any less of a burden? Because it doesn't include monthly reporting mechanisms. It doesn't include annual audits. It doesn't include three year engineering reviews. It doesn't include a liability for messing up those compliances. It doesn't include continuous measuring prescriptive requirements for taking out your gas analyzers and installing. But I thought you just said there's no question that whatever information EPA thinks it needs to ensure that it's getting the right feedstock into the system. It could require the natural gas producer, sorry, the renewable gas producer to demand that same information from the biogas. It could require them to get the documentation that that's required. And that documentation could be exactly what they're asking for here. Well, I think we'd be back here if they tried to impose the exact same burdens. You wouldn't have your statutory argument. We may not. I think, you know, there are ways in which they're trying to circumvent the limits on their authority by, you know, through someone else. Under Roman at three here can be requiring these parties to impose identical burdens on biogas producers. I don't think they want they want to play. I think the obligated parties need to verify that they have met the volume obligations. I think EPA can require the obligated parties to do that. This three here is not just about meeting your fuel obligations. It's about meeting your fuel obligations with the right stuff and the right process stuff. Absolutely. Compliance provisions are. And so I'm back to saying if they could say to you, renewable fuel producer, don't let anything into your pipes and don't transport anything down to a pipeline or a truck or whatever you're using. It hasn't first been verified by a biogas producer who does. Testing, auditing and all the other compliance provisions you were referencing. If they can do that, then what's the difference between just doing it directly? They did that before. And what EPA admits is their own numbers suggest that the burden they're imposing on biogas producers has increased 59 fold because of what I'm saying is it's. If it's if EPA requires the renewable fuel producers to impose that exact same burden that they're just imposing directly. There's no difference again, that's a different situation. We may be back with the statute argument about them trying to circumvent the limits on their authority, but but that's not the situation we have here. They are imposing direct regulation. And if you're, you know, if you look at compare the two regulates programs, so subpart M of the regulations is the renewable fuel standard programs. That's the normal way that they regulate and that they comply and they ensure that renewable biomass is met and they ensure that it's used as transportation. It doesn't directly regulate the feedstock producers. It just doesn't doesn't have a section for it. They created a whole new section right in part E that has specific provisions that are onerous requirements that are going on directly to the biogas producers and imposing liability directly on them. And I think that's a meaningful difference here, meaningful difference from the statutory perspective. And I think it's a meaningful difference from the arbitrary and capricious perspective. I mean, and under the EPA, if they opt in, I'm sorry, how is it imposed if they opt in, it is imposed is imposed if they want to participate in the program. If they choose to participate, here's the rules of this process and they have to be these rules to meet Congress's goals. That's the EPA's position. You make the point, maybe it's right that they're all going to say, forget it. Too much trouble. I'm going to do something else with this waste or just let it sit here or burn it off or whatever. And that will be a huge problem for EPA to deal with. But it doesn't become imposed when you simply say, if you wish to participate in this program and make a lot of money for that waste that's otherwise sitting there. There are requirements to make sure it's being done right. So I think in a market incentivizing program, a market forcing program, that does make a difference. But even if you disagree with me on the statutory process, if it actually does disincentivize, which is just an empirical question we don't have, and that's a policy call for EPA. So right. But when you get to arbitrary capricious, what are the fundamental principles of the EPA is explaining at a minimum and providing a reasonable explanation why you're treating similar situated entities differently. And I think that's a problem for EPA here. I think that's a problem that they don't actually regulate feedstock producers under any other part of this program. This is the only one. And I don't think that they have faced up to that. And I don't think they have provided a reasonable explanation about why that is. Well, I don't think they're taking the position that this is the only way they can get the information. They're just saying it's the best in the context of this program. But why isn't it the best elsewhere? Right. I mean, even if you look to the end of this program. So let's step out. Arbitrary capricious rule is that agencies have to go in, jump in with both feet. They can't start with one area and then work into other areas. True enough. That's pretty well settled. But they've got to explain why they're treating it differently. It may be that they could say that it would be sufficient to explain why this is the one we're going to choose first, because this is the there's been fraud, but there hasn't been any incidents of reported incidents. Expanding is growing. It's gotten a lot more complicated. We're concerned about fraud. If we thought that were a sufficient explanation. I know you think it isn't. And that would meet this need to explain why they're starting here. If you think that's a reasonable explanation for why they're treating bio producers differently. I don't I don't actually don't think they are. They've said that. I think what they said is we're going to throw out the old system for that reason and implement a new system, not what we're going to go beyond what we've done elsewhere for those reasons. But if you think they did said that, I disagree with that. And if you think that's sufficient, then then obviously we lose that that angle on the APA challenge. I don't think that is sufficient because I don't think that they they said that. And I don't think that they have actually justified that. Do you think they were asked to and therefore required to explicitly acknowledge that they were taking a different approach here than in some of the other programs? And then justify that. OK. Yes. Can I ask you about the pipe? The third argument you said? I know we've been stuck on the first. Yes. The pipeline specification. I actually think the best way would be if you could just tell us what the crux of that argument is in your view. Sure. So among the biogas reforms, what they've required is annual testing by RNG producers of the RNG, the renewable natural gas that's interchangeable with fossil natural gas that they're injecting into the pipeline, the commercial. What they said in the rulemaking, they gave two reasons for that. The one is that is fuel quality. They need to ensure the fuel quality of the RNG. And two, they need to ensure that the RNG can be injected into the pipeline. Before this court, I take them to have abandoned the first rationale and focus only on the pipeline specification rationale. The problem for that is twofold. First, they can't explain why we need to provide annual testing that we meet the pipeline specification when they also require RNG producers to prove that. In fact, the RNG was injected into a commercial pipeline, a regulated commercial pipeline, and RIN separators to also prove that they withdrew the RNG from the pipeline. The statutory requirement here is that RNG is used as a transportation fuel. And if it was injected into the pipeline, as a matter of fact, and it was withdrawn from the pipeline, as a matter of fact, and used as transportation fuel, it's lost on me why we need to also prove that it could have been injected into the pipeline. And one more thought, one more point on that, Your Honor. If you look at the regulations, they, on their face, go beyond just the pipeline specifications. They also allow EPA to request any other information, any other testing as a condition of registration. So just on the first bit of that, it does seem like the problem you're complaining about, I guess, is redundancy. The pipeline, of course, has already tested if they're going to allow our gas in, so why do we need to retest and send the results to the EPA? And it just doesn't seem that unreasonable to me for the EPA to ask you to send that testing result so it can have its own documentation of what's going into the pipelines itself. But statutory requirement is that it be used as a transportation fuel, not that it can go in a commercial pipeline. The next, the regulatory requirement is that it can go into a pipeline. And so we've already now – we're two steps removed from the statute at this point, and we already have proven twice over that the – that it did go into a pipeline. And so beyond that, I think it's hard to explain, and it's just, I think, unreasonable and arbitrary to impose unnecessary burdens on R&G producers to do that testing and to report it. So the second thing they say in responding to comments is that both so it can get into the pipeline and so that the R&G can be used to produce and be used as transportation fuel consistent with CAA and EPA regulatory requirements. Yes. Now, that's the argument that you're taking them to have abandoned? So I'm not – in the response to – in the final rule, they also said we're balancing our requirements to sort of measure fuel quality, ensure fuel quality. This piece about whether, you know, is it possible to be used as a transportation fuel, I'm not sure, actually, I guess, if they're relying on that here or not. But I would point out that the RIN separator has to prove – So that's the question. Wouldn't that be a justification that isn't trying to impose a fuel quality standard, nor is it just saying give us the results of your pipeline test? It's trying to ensure that it can be used as a transportation fuel, so we need to test for these other components on a uniform basis. So I think no for two reasons. First is the redundancy point already. It's not going into the pipeline, but it can't. And I guess the other redundancy point is that the RIN separator has to document before they can separate the RIN that it was actually used as transportation fuel, that it was withdrawn from the pipeline and then actually used, compressed to CNG or LNG, and then used as transportation fuel. So we've got the same problem where we've got documentation that it was used as transportation fuel. That's the statutory requirement, and we're imposing additional obligations beyond that for no apparent reason. Well, it seems like you'd have to say it's been properly injected into the pipeline and then properly used as transportation fuel. And the point of EPA asking for this verification is to verify. And now you think the concerns about fraud are made up, but if they had some basis for that, again, they're just asking for some maybe redundant verification. So the concerns about fraud here have nothing to do with using natural – as far as I know, and nothing in the record – about using natural gas that is not capable of being used as transportation fuel. The concerns about fraud are mixing fossil natural gas and renewable natural gas, or in some instances they say mixing fossil natural gas with biogas. That latter makes no sense at all, Your Honors. I mean, biogas is about 50 percent methane. Renewable fossil natural gas is about 90 or plus. There's no basis to think that would happen. Unrefined biogas is not going to qualify. They don't want to mix with that at the pipeline stage. I'm sorry? Just unrefined biogas, which could be from any feedstock. Sure. It's not. It's not. If they don't want it mixed with that, there's a reason they've limited the feedstock. Absolutely, Your Honor. I think that's right. I mean, my point was only that there's no legitimate concern, no plausible concern that there are parties out there mixing fossil natural gas with untreated – with raw biogas. The rationale is these RINs are really, really, really valuable relative to the fuel itself even, let alone the waste that's sitting out there. And so people are going to have incentives to bend the rules and try to sneak other forms of gas to get mixed in here. And so we're not just going to leave it to the pipeline. Congress told us to do the insuring, and so we're going to insure up front, and we're going to insure on the exit end. I'm still having trouble understanding why that's arbitrary and capricious. Because that's the situation across the renewable fuel program. That's the situation for all renewable fuels. And it's only this one, only biogas, that they have decided to regulate the biogas producer directly. We don't object. If they regulated everybody, you wouldn't have any – the same, you wouldn't have any objection. It's simply because they've only begun the biogas. So if they regulated everyone, if they regulated or explained why they were doing it, except people treating similarly situated entities differently, obviously I wouldn't have that argument. Now, I would still have the statutory argument, Your Honor, that they have regulated or restricted RIN generation to the RNG producer and beyond. Right, but this is the same argument then as you made before. It's not that it's inherently arbitrary and capricious to check on the way in and check on the way out. It's that you just can't do it for one renewable fuel and not others. That's your argument. I also think it's unnecessary. They haven't shown the basis for that. They have – they pointed to the concern about potential fraud, but there have been no recorded incidents of fraud. You can go look at the rules, sites, their enforcement page, and you can go look at the cases on there. None of them have anything to do with biogas. They do – there are cases with regard to other renewable fuels, but none have to do with renewable natural gas. And so I think if you were going to take a rational approach to where we're going to implement these additional fraud protective measures, you would do it in a case where they're in an instance in an industry where there has been reported incidents of fraud, not here where they admit there has been no reported incidents of fraud. I just had one last question. You complain about the compliance date, but they say it's the date you asked for. So we've complained about two dates, Your Honor, both the July 1 date, which we did object to, and the January 1, 2025 date. I think importantly on that point, we objected to that along with a bunch of other owner's obligations they impose, including the continuous measurement, prescriptive continuous measurement requirements that we haven't had a chance to talk about this morning. They didn't change those, and they imposed additional obligations. I think that's what makes the January 1 date problematic. Did you say when you suggested January 1, 2025, that that's conditioned on you not having these owner's obligations, or that you think that's an appropriate compliance date? I think what we said is at least January 1, 2025. I don't know that we went to the specifics to say, and everything we say here in our other comments, we assume that you would take some. Why are you not a stop from challenging it now? I'm sorry? Why are you not a stop from challenging it now? You said at least January 1. I said, fine, we'll give you January 1. Because the premise of our request for January 1 of at least January 1, 2025. At least means that fatal word for me. The premise was that we have to get everything else we want to. I think we've got to get – I mean, the continuous measurement requirements are a particular problem here. There are others. You didn't make that explicit when you said at least January 1, 2025. I do not believe we made that explicit. I'm not aware of a requirement to do that. Okay. Thank you very much. Thank you. We'll give you a few minutes for rebuttal. Thank you. Kimball, you're just addressing statutory authority. Is that right? That's correct, Your Honor. May it please the court. I'm Department of Justice trial attorney Kim Marie Kimball here today on behalf of EPA. EPA has a statutory mandate under 42 U.S.C. 7545-02A1 to promulgate regulations that ensure transportation fuels sold or introduced into commerce in the United States contains the requisite amount of renewable fuel. And the statute further provides that renewable fuel is only fuel coming from qualifying biomass. Therefore, the statute requires EPA to ensure that renewable fuel actually does come from that biomass. So if you're right, why isn't subsection 3 superfluous? I'm sorry. Why is that subsection 3 what? What is the purpose of 02A3? 02A3? 02A31 on your reading. Why isn't that superfluous? Romanet 3 is not. I'm sorry. Sorry. The provision that says the regulation shall contain compliance provisions applicable to refineries, blenders, distributors and importers, so forth. Okay. I think that's clause 3. Why isn't that superfluous if EPA can also regulate other entities? Because in Romanet 3, what Congress said was you have to ensure that the obligated parties, that the people who have to ensure the volumes meet all of the components of the paragraph. And so EPA has interpreted that to be primarily about volumes. It's not about what the renewable fuel is. Sorry, go ahead. As Mr. Ellis pointed out, it says shall contain compliance provisions applicable to these obligated parties as appropriate. Right. And that sort of seems obvious just based on clause 1, if all it means is you can regulate those people, but you can also regulate others. I'm not sure I understood your answer. So clause 1 doesn't specify anything about the obligated parties. It says the EPA has to ensure overall in this program that the fuel introduced contains the requisite amount of renewable fuel. And then Congress further specified what that renewable fuel can be. In subsection 3, Congress said when you promulgate regulations, you have to at least promulgate regulations that address this group of people. It doesn't say at least so. It doesn't have including language. It says it must contain. And elsewhere in the statute when it says contain, contain means that plus something else. So, for example, in the volume requirements. Contain means? Contain means whatever it's referring to plus something else. So, for example, in the volume requirements, it says it must contain the requisite amount of renewable fuel. But it's not that it has to be exclusively renewable fuel. It's renewable fuel plus whatever else. Contained in this statute is used to say. The question is not so much contained as compliance provisions applicable to. It's the to whom compliance provisions are applicable. That's the critical language. And they list everybody but producers. Everybody except renewable fuel producers, you mean? Producers, period. Biogas producers or renewable fuel producers. Producers are just noticeably absent from this list. This isn't sort of a list that there's going to be seven other things that aren't covered and including list. It seems to say compliance provisions under the regulations under Roman at one. The compliance provisions shall be applicable to. And then starts with refiners. Flows right past producers. They knew there were producers. Biogas producers and renewable fuel producers. And yet they're off the list completely. EPA has understood those compliance provisions to be referring to the volume requirements, the volume compliance provision. So they have to meet the specified amount of fuel in each year. And then you agree this doesn't apply to producers. Sorry. Do you agree? Roman at three is not a source authority to impose compliance provisions on renewable fuel producers. That's correct. It's not. That's correct. Roman at three applies to obligated parties. EPA is authority to regulate. Renewable fuel producers comes from Roman at one, which refers to the requirement to cross references. This says this is regardless of the data that regulations promulgated under clause one. It shall contain those regulations in clause one shall contain compliance provisions. That apply to obligated parties, right? So Roman at one covers the whole program and Roman at three says of all of the of the provisions that of the regulations that you promulgate. You must have compliance provisions for the refiners letters and and importers. But it doesn't preclude EPA from regulating renewable fuel producers. And in this in the structure precludes you from imposing compliance provisions to ensure volume requirements. Volume requirements, including that it be the right stuff statutorily. On producers. So I think those are two very different things. They volume requirements and ensuring that it and ensuring that biomass is what is resulting in volume. They care about what the volume of what they can't make sure some volume comes out at the end is not what this program is about. It has to be volume of very specific thing. And that is renewable fuel from the very feedstocks that Congress allows. So that can't possibly be. That this doesn't mean compliance with. The process of making sure that we get the renewable fuels that we want and not other types of fuels, whatever the volume. So Roman Roman at three provides the that the refiners blenders and importers have to comply with the volume requirements, which I take your point includes the that it be the correct volume. Right. Right. The going back to what the renewable fuel that the renewable fuel has to contain the requisite has to be produced from the biomass. That's a function of Roman at one plus the plus the definition of what renewable fuel is and what renewable biomass is. It's part of the structure of the statute. I know you want to treat one is freestanding, but three. Three says who will bear the compliance provisions for regulations promulgated under number one. You can't sort of say that one is this freestanding authority. Except that it that it only says that the compliance provisions have to have to contain provision. I'm sorry. It says that the regulations have to contain provisions for those entities, but it doesn't say that it exclusively compliance provisions. That are applicable to. All right, so it's not just compliance provisions is as to whom they will be applicable and producers. You can't just have compliance provisions. They have to be applicable to these folks. Right. And when they list everybody who's involved in the process. They want compliance provisions to to apply to, and they leave out one. And that is producers. How do we know that's just not a deliberate decision by Congress that compliance provisions for regulations under Roman at one will not apply to producers. They skip right over them and go right to refiners blenders importers distributors. Because there's no way there's no way to enact the rest of the statute and there's no way to there's no way to ensure any of the definitions are met without also looking at the renewable fuel producers since the beginning of the program EPA has regulated the renewable fuel producers. Because you have to do that under the program, not under. Not under 1 here, not 2 at 1. Okay. EPA has never claimed authority under the under the provision as its exclusive authority to regulate the renewable fuel producers. He has always claimed that authority under Roman at 1. Is there any cases as you have it. That I'm sorry, any cases for what you may have claimed it as any case held that you have it. I, I'm not aware of any case in which that's been that's been challenged and come to a decision. Is there anybody office lists. That would be relevant to for compliance provisions to ensure volume requirements. Other than producers, did they leave anyone else off this list. An illustrative list, or you think this is an exhaustive list. I think, well, I think that Roman at 3 sets a floor for who the compliance provisions, meaning volume requirements apply to who else would be producers who else. Well, so, I mean, floors that usually assumes there's more on top. So, it would be who else. So, in renewable fuel production, there, there are renewable fuel producers under the current system. They're also by intermediate producers. There are producers. They may have different producing jobs, but producers. That's correct. It's really weird for Congress to set a floor that lists. Everybody that they want to cover. But the rest of the statute, and the definition of renewable fuel, and the requirement that ensure that that fuel includes renewable fuel. And that renewable fuel is produced from qualifying biomass requires to regulate renewable fuel producers. If it were the case that EPA could only regulate the obligated parties, refiners, blenders and importers, then there would have been no reason to include any requirements on biogas at all. Because biogas never gets to a refiner. Biogas is put onto a renewable natural gas pipeline. It's taken off by a compressed natural gas producer and compressed it directly into into what goes into a natural fuel vehicle. There's there's no step in that process. Answer the question. What their theory is, it's fine to regulate renewable fuel producers. As part of the rent authority, right? You can't get the wren won't attach unless you do A, B, C, D, and E. So that's how you get to do renewable fuel producers with that. There's nothing in the statutory text that limits EPA's authority in that manner. There's nothing in 05 that says EPA can only regulate the producer. 05 doesn't refer to the producer in any way. Is there any way in which it is not statutorily sufficient to do renewable fuel producer regulation under other statutory authorities and not under three? Can you can you can the program work? If you can regulate renewable fuel producers under other statutory authority. The Roman at one is the is the under other statutory authority program. Well, the rent program requires EPA to set up this credit program, but there's nothing in that provision that that says who EPA regulates under that. No limitations on whoever anyone who's in the rent program and renewable fuel producers are part of the rent program, right? Renewable fuel producers are part of the are part of the rent program. It's true. Definitely regulate them there. I'm just asking why it wouldn't be sufficient to say that the rent program is your sufficient authority for regulating renewable gas producers, renewable fuel producers there. And then the extent you have regulations under Roman at one. Those can only be applied to the later steps in the process. The refiners not down the line. That's not how EPA is conceptualized. I'm not asking whether the scheme because you keep going. The scheme won't work. I'm asking whether the scheme will work. Well, I think it's difficult to say because EPA has not conceptualized. It has not conceptualized its authority in that manner. I will say, though, if if the answer to me can be in that, the program will work if it's read that way. But it doesn't seem like you can say that. Well, I don't I don't think I can say whether or not EPA has authority under 05 to regulate to regulate renewable fuel in a sufficient manner in order to ensure that it that it contains the requisite amount of biomass because EPA didn't rely on that authority in this rulemaking. And I don't know to what extent it has considered whether the Ren program itself is sufficient to to provide statutory authority. This is the first time EPA has ever used this authority under a way one or one in three to regulate. Producers renewable fuel producers just under one, but it has always regulated producers under that statutory provision. EPA has always considered that to be the source of its authority to regulate renewable fuel producers. And so you read three as not limiting, not words of limitation because because it just says that EPA must or EPA should put forward regulations that contain compliance provisions for that group. But that that's not as I say, some regulations, regulations promulgated under clause one, right? But it says it's just some of the regulations, not all the regulations that that sets the floor for for what regulations they provide. EPA had to at least provide regulations that set compliance provisions on the on the obligated parties, but that through the statutory framework as a whole, EPA has to be able to regulate the renewable fuel producer and has to be able to regulate for biogas. Specifically, that has to include the ability to regulate biogas because biogas is unique in this program in that in that the biogas producer gives the renewable the renewable gas producer just biogas and not the biomass itself. And so the renewable gas producer does not doesn't see the biomass at any point. So so EPA has to be able to regulate the biogas producer in order to comply with its obligation to ensure that the renewable fuel came from the requisite biomass. Thank you very much. Thank you. To address a point raised by Petitioner today, Petitioner claims that EPA's regulation of biogas producers arbitrary because they're like EPA's not doing things like they're doing in other aspects of the program. What Petitioner ignores is that biogas producers and RNG generated from biogas is different than other aspects of the program. Let's take an example that we referenced in our brief. Petitioner claims that EPA is attempting to regulate a feedstock provider here. That's not the case. In the example provided in the brief, Petitioner explained that this would be like trying to regulate the corn farmer. Whereas today, Petitioner is explaining that the regulation here is different because EPA is only supposed to regulate the party that converts the feedstock into renewable fuel. But here, there's an extra step in the process. The feedstock goes to a biogas producer. The biogas producer oversees the digestion of that feedstock, which turns into biogas and later has to be upgraded into renewable natural gas. Council, that might be a good explanation. It's the explanation on page 42 of your brief, but there's not a citation to the record. And so I think what you need to tell us is a reason why this explanation wasn't either somewhere in the rulemaking where EPA gave the explanation you just did, or a reason EPA wasn't required to give that explanation. And are you leaning towards the latter, or is there something in the record you can point us to? We believe EPA provided a reasonable explanation here for regulating biogas producers. The difference between the other aspects of the program, I don't have a record site ready today. But EPA explained in other aspects of the record that it's regulating biogas producers because they directly oversee the production of biogas from feedstock. For example, at Joint Appendix 547 to 49, in the response to comments, EPA explains that biogas producers are directly responsible for overseeing the generation of biogas from renewable feedstock. And that is the reason why EPA needs to directly oversee them in this program and enforce compliance provisions, because biogas producers are the party that's responsible for the information that determines whether the renewable natural gas that is used as the source of fuel in this program derives from a renewable source. I guess the question I'm struggling with is, that's, as you've suggested, is different from whether there was a compare and contrast done explicitly by the agency. And, you know, there might be, maybe it wasn't teed up well enough for EPA. I don't have, you know, the answer to that either. But it seems to me you need to have an explanation of why you weren't required to give a comparison and this explanation of why you can regulate biogas producers but not corn farmers, why you weren't required to give that explanation. To the extent that the court's asking whether EPA has the authority to address that, to regulate the corn farmer. Mr. Ellis's argument proceeded as if a huge issue in this rulemaking was, why are you regulating the biogas producer but not the corn farmer? And it seems undisputed there was no explanation why you're regulating the biogas producer and not the corn farmer. And if everything I've said so far is right, that would be a big problem for you. We don't agree, Your Honor. We don't know that the requirements here require EPA to provide a compare and contrast with other elements of the program. We believe EPA is required to provide a reasonable explanation for regulating the parties that are at issue in this rulemaking. And EPA did so. It explained that biogas producers oversee the production of biogas from feedstock. It explained that these parties do provide information that EPA needs to determine that the RINs generated from renewable fuels are provided here. But if every biofuel producer process is going to have the same question of, we've got to ensure that it's the appropriate source, why didn't EPA have to say why it was taking on biogas? EPA did explain here that biogas is a complicated program, that it's one step removed from the feedstock here, and that the reason for implementing these regulations... More complicated than the other biofuels? Yes, Your Honor. Why? Because the other biofuels are that when you process, let's say, corn into fuel ethanol, that's one step. And when you process the corn, you get the ethanol that's used as fuel. That party, as Petitioner concedes, is regulated because they're the one producing the fuel from the feedstock. Here, the party that's producing the fuel, the RNG producer, who is the RIN generator under this program, does not oversee the digestion from where the feedstock originally came from. There, that's the biogas producer. In some cases, those may be the same party, but in cases where they're a separate party, the way EPA would previously oversee them was to have the party submit contract information and reports that it obtained from the downstream party. But here, EPA has determined that it's appropriate to obtain the information directly from the biogas producer because they're the ones that oversee it. They're the ones that need to comply with the requirements and provide that information. Oversee what? Oversee the production of biogas from feedstock. So they're not simply selling trash to a renewable fuel producer, and they're the ones that turn it into fuel. They actually oversee a conversion process that later goes to an RNG producer. An RNG producer who gets the biogas can't take the biogas and say, this comes from a waste product or corn or something else. The party that oversees that process is the biogas producer here. Can I ask you about the pipeline testing requirements? As I understand it, one of their points is that EPA has required testing for components that are not necessarily in whatever an individual pipeline would test for. And then you haven't sufficiently explained why that requirement has been imposed. What's the response to that? So the regulation does provide. So EPA does provide that pipeline that RNG producers have to provide testing that demonstrates that RNG can be placed onto a pipeline. There is a specific exception in the regulation itself. That's a 40 CFR section 80.135 D5 and D6 Romanet 5. That provision provides that if an RNG producer claims that a pipeline doesn't require testing of other elements, or that a test does not require a pipeline producer to RNG producer to demonstrate that certain elements are required for that pipeline, they can request an alternative testing process. And that operates as an exception to what's required in 80.155 B. 80.155 B provides for the specific tests that the pipe that the RNG producer has to provide. They have to run those tests in order to follow those methods to do the tests. So, even if so, I think their complaint is, for example, you tell us to I'm going to mangle this. I'm sure test for siloxanes. But some pipelines don't require testing for siloxanes based on the type of folks they're working with. Are you saying that they can ask for a waiver that would allow that producer not to test for siloxanes? Yes, your honor. Okay. See. And to address some of their concerns regarding that. Why can I ask one other question about this? So, it initially seemed odd to me that you have a list of things that must be tested for, but not at least that I could find standards that they have to meet. Is that because all EPA is doing is comparing these test results to the pipeline requirements that were that have to be separately reported? What are you comparing the test results to? The test results are meant to show that. So, the party, the RNG producer, when they register with EPA to say, I want to get into the program to generate RINs, they have to provide the pipeline specifications for which they are putting the product onto the pipeline. These regulations, to clarify, and I know this is a long-winded explanation, but in the pathway to which these requirements apply, they apply to RNG producers who generate RINs through uploading onto a commercial pipeline. So, when they register to do that, they have to provide EPA with the pipeline specifications, so saying, here's what the pipeline requires. And then when they register, they're telling EPA, not only through the engineering reviews that we require do we have a facility that's capable of doing this, but we are, in fact, capable of upgrading biogas into renewable natural gas that can get onto a pipeline. So, it's a demonstration at registration to show that the party has a business being in the program. And when you get the annual testing results, you are measuring that against whatever the pipeline specifications are to double-check? So, EPA requires that information. So, yes, it's. Yeah, I see. All right. Thank you very much, Councilor. Thank you, Governor. Mr. Ellis, we'll give you three minutes. Thank you, Governor. Just a few points in rebuttal. First, on the statute, I think I heard my friend say that they are not relying on O5 in this rulemaking to confirm that. That's not the rulemaking. I'm not surprised, but I think it's confirmed. So, that means they have to rely on O2A1. How can they rely on that since it applies to generation of credits by persons that refine, blend, or import? So, I understand. How would producers fit under there? So, I understand that provision to allow for the creation of the credits that are ultimately – and the creation of the credits, I don't think I've ever seen an explanation of this, so this is my understanding of it, is it happens when you separate the REN at the end of the process. And then the generation happens by the RNG producers. That's been – or the renewable fuel producers. That's been the way that they have – Generation in the statute is by any person that refines, blends, or imports. They don't mention producers here either. So, I think that the way they have – again, I'm sort of – Your theory is that they can regulate renewable fuel producers. Your theory is – Absolutely. Yes, and that's how we – It doesn't list producers just like 3 doesn't list producers. But it does allow specifically for the creation of credits for those obligated parties. And I think that the way that they have set up the system from the get-go is that the renewable fuel producer is the one who generates the REN that's ultimately separated, and they regulate it that way. Congress lists in the statute regulations of persons that refine, blend, or import. That concludes the authority to regulate producers if they're part of the generation process. I think there's an important difference in language in O2A3 and O5. O2A3, you're right, provides for regulations of – so, contain compliance applications applicable to the obligated parties, as you noted, Your Honor. O5 says to provide for the generations of an appropriate amount of credits by a person. They have provided for that appropriation – that generation of credits by this REN system. That allows you to then generate the REN at the beginning when you produce the renewable fuel. It says who can generate the RENs. That's what I'm trying to get to. I'm sorry? It says who can generate the RENs. No, it says who can – Refiners, blends, or imports. It says who can have the credits, who can generate the credits. I think the credits, I think, have to – you have to generate a REN and then separate a REN. And that's the credit that you can then trade. What is the statutory language that says anyone or producers or assures me that producers can generate the REN in the first place? So, I think O5 is the best I have. The thing I will – I didn't say anything. I didn't mention producers anywhere. So, if I can add to that point, this is the way they've always done it. And they did it before Congress amended RFS 1 to make RFS 2. They regulated – they promulgated this system. They announced they're doing it under O5. I'd encourage you to look at the rulemaking for RFS 1. And then Congress amends the statute, including amending O5, and does not say anything about – does not question the process that EPA had just set up under O5 to generate these RENs. I think that that is – They said they had always been regulating producers, renewable fuel producers, under 1. 2A1 or 1A2. Let me get the page. Under 2A1. They've always been doing it under 1, and Congress didn't change that either. That's not how I read the rulemaking record, Your Honor. I would look at 71 Federal Register 55552. They expressly cite O5 in the very first RFS 1 rule when they set up the credit program. And 71 Federal Register 55557, that talks about how the R&G producer is going to have to show the – have the auditing done to show that the requirements are met when they generate the REN. That's what they did from the outset. That's what Congress ratified. If I could return to a couple other points, Your Honor. I wanted to just point out that O2A1 – or A3, rather. You pointed out that it says shall contain applicable to the obligated parties. It goes further than that, tying it back to O2A1. At the end of O2A3, it says you can promulgate these regulations, quote, to ensure that the requirements of this paragraph are met. So that's the way you ensure. O2A3 tells you that's the way EPA is supposed to ensure. I think that implicates this Court's discussion in heating, AC, and refrigeration that says to ensure is to make sure certain and safe. So Congress tells EPA to ensure. But when all it said was the agency should guarantee that result, the rest of the statute tells them how to ensure. That's what O2A3 does, and we don't think that they can rely on O2A1 in the absence of that to expand their authority. The last thing I'll say on the statute, she said – excuse me, I'm over, so I'll wrap this up. She said – you asked will it work. It does work. It has worked. It works this way for every other renewable fuel producer, and I don't think they've provided any explanation for why they departed to here. If I can make one last point, you asked, Your Honor, about if this was a point in the rulemaking. JA369, Kinder Morgan raised this point. JA438, we raised this point, that they shouldn't be treating biogas producers differently than the other producers. Thank you very much, Counselor Casey.
judges: Henderson, Millett, Garcia